John M. WALLACE and Glenn W. Wallace

v.

The UNITED STATES.

Leland S. SWANER

v.

The UNITED STATES.

Nos. 77-53, 78-53.

United States Court of Claims.

Dec. 5, 1956.

Robert P. Smith, Washington, D. C., for plaintiffs. D. A. Baker, Joseph W. Kiernan, Robert V. Smith, and Smith, Ristig & Smith, Washington, D. C., were on the briefs.

H. S. Fessenden, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. Andrew D. Sharpe, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This action is brought to recover income taxes allegedly improperly assessed for the year 1948 against the plaintiffs John M. Wallace and Glenn W. Wallace, jointly as husband and wife, in the amount of $52,982.54, and against the plaintiff Leland S. Swaner in the amount of $36,985.23.

Two issues are involved, only one of which is common to both plaintiffs. First: The Commissioner of Internal Revenue determined that the plaintiff's 1948 income was understated due to his determination that there existed a partnership between the two plaintiffs, John

M. Wallace and Leland S. Swaner, and a third party, Zion's Cooperative Mercantile Institution (hereinafter referred to as Z. C. M. I.), for the purpose of buying and selling interests in the Remington Small Arms Plant, and that such transactions resulted in a profit to the partnership of $189,919.93, 30 percent of that amount being taxable as ordinary income to both Wallace and Swaner as their share of the partnership profits, the third party having a 40 percent interest. Defendant does not rely on the partnership theory as a basis for the additional taxes, but does contend that plaintiffs were enriched in the above amount as the result of compensation or fees charged for services rendered. Thus, the issue is to determine whether or not plaintiffs received any income from transactions relating to the Remington Small Arms Plant whether it be as the result of partnership income, or fees or compensation for services rendered.

Second: The Commissioner determined that the Wallaces' income was further understated by reason of an exclusion from taxable income by them of 70.93668 percent of a dividend of $20,000 received by Mrs. Wallace from the Excelsior Iron Mining Company during 1948, the exclusion being made on the ground that that portion of the distribution represented dividends paid out of profits, earnings or increases in value accumulated prior to March 1, 1913, the plaintiff relying on section 115(a) and (b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 115(a, b). Defendant concedes that 70.93668 percent represents that portion of the dividend not earned in the current year, but argues that since plaintiff had already received under the sections of the Internal Revenue Code applicable in such situations tax exempt income in excess of the cost basis of the stock held by them, and since there was no proof of the cost of the distributing company's property or of any increase in their value before March 1, 1913, any subsequent distribution of that nature must be taxed as a capital gain according to section 115(d) of the Internal Revenue Code of 1939, 26 U.S.C. § 115. Thus, the issue is to determine whether capital gains taxes should be assessed against 70.93668 percent, or $14,187.34, of the $20,000 distribution to taxpayers in 1948, or whether it is completely tax exempt even though tax exempt income in excess of the cost basis of the stock to plaintiffs has been recovered by them.

The issue common to both parties will be discussed first.

The facts reveal that the War Assets Administration, an instrumentality of the United States Government, had for two years, from 1946 to 1948, attempted unsuccessfully to sell one of its surplus facilities, the Remington Small Arms Plant. Apparently the chief reason for the failure to sell was the agency's refusal to sell the property piecemeal. It was aware that various institutions were interested in acquiring parts of the property but, not desiring to be left "holding the bag" with the least desirable or valueless portions of the property, would accept bids only for the entire plant. In accordance with this policy, it suggested that all interested persons and organizations join together and submit a joint bid for the entire property. Pursuant thereto, several organizations and individuals banded together for the purpose of bidding for the plant and purchasing it if the bid was accepted. This group, namely, the Utah Wholesale Grocery Company; Associated Food Stores, Inc.; Utah Power & Light Company; Imperial Upholstering Company; Zion's Cooperative Mercantile Institution and the plaintiffs, John M. Wallace and Leland S. Swaner, submitted on April 20, 1948, a bid for the property in the amount of $1,620,000, which bid was submitted in the name of plaintiff John M. Wallace and two other Salt Lake City residents, Harold H. Bennett representing Z. C. M. I., and Leland B. Swaner, father and representative of plaintiff, Leland S. Swaner, who were selected by the group to act as their representatives.

Each of the above organizations, all of whom had previously expressed an in-

terest in and attempted to acquire part of the plant from the War Assets Administration, orally agreed to pay for the buildings and land they had selected at prices they had fixed thereon. The plaintiffs joined the agreement for the purpose of acquiring for investment the leftover acreage, unselected parts of larger buildings, smaller buildings and other odd pieces of property not desired by the other participants. Plaintiffs, therefore, were to pay the difference between the total bid price and the values affixed by the other participants. Plaintiffs' share ultimately worked out to $74,077, each to pay one-half. A large part of the remaining land was unimproved and the remaining building space was considered of much less value than the other improved property selected by the above organizations. The entire plant was itself in a rundown state due to the lack of maintenance for over two years.

Wallace, Swaner, and Bennett in whose names the bid was submitted, were selected as representatives of the group as the result of a suggestion by the War Assets Administration that representatives be selected. They were to handle all transactions and details incident to the bid. They were to receive title to the property if the bid was accepted and were then to convey the selected parcels of property to the other participants at the agreed prices. It was for this reason, therefore, that title to the property was eventually transferred to them by the War Assets Administration on February 1, 1949, after the final installment on the purchase price was paid. Immediately thereafter title was transferred by them to the respective group members according to their previous commitments.

Previous to this, however, the group's nominees, Wallace, Swaner, and Bennett, had entered into written sales agreements with some of the participating members conveying to that member the particular piece of property it had previously selected. These agreements when taken alone would tend to indicate that the nominees bought the property from the War Assets Administration in their own right for resale to the individual group members. The agreements, however, which listed Wallace, Swaner, and Bennett as "Sellers" and the contracting group member as "Purchaser", were for no other purpose than to formalize the oral commitments already existing between these participating bidders. The words "Sellers" and "Purchaser" were apparently merely words of convenience since Wallace, Swaner, and Bennett were at all times in question no more than representatives of the group itself.

These agreements, plus the fact that the bid was made in the individual names of Wallace, Swaner, and Bennett and the purchase price was paid by them—though they merely forwarded the money paid them by the other participants—and the fact that the land was transferred from the War Assets Administration to them in their individual names and was thereafter transferred by them to the participating members by the usual methods of conveyancing, probably led to the mistaken impression of the Commissioner of Internal Revenue that these three representatives of the group constituted a partnership for the purpose of buying the property and then reselling it to the group members.

After assuming there existed a partnership, the Commissioner, notwithstanding the fact that the property was purchased from the War Assets Administration for $1,620,000, placed a valuation on the property of $1,981,367 as of the date of the purchase. This was arrived at by assigning as the market value of each piece of land purchased by the participating members the price paid by that participant, except as to the property held by Wallace, Swaner, and Z. C. M. I. Plaintiffs actually paid only $74,077 for their property but a market value as of the time of the purchase of $321,710 was assigned. Z. C. M. I. actually paid $553,000 but a valuation of $695,757 was assigned. No explanation has been advanced as to how this increased market value was arrived at.

Using the total valuation of $1,981,367 as the market value of the entire plant, the Commissioner of Internal Revenue then ascertained the percentage of that figure that the price paid by each participant represented, with the exception of the plaintiffs and Z. C. M. I. That percentage was then applied against the $1,620,000, less $29,023 paid by the Mountain States Telephone Company for telephone and telegraph facilities. The result supposedly represented the cost basis of each of the various pieces of property concerned. The difference between that allocated cost and the actual price paid by the participating member was considered by the Commissioner to be a profit to the alleged partnership. It is this profit upon which the plaintiffs have been assessed additional taxes.

We hold that, as a matter of fact, no partnership existed and that Wallace, Swaner, and Bennett, acting at all times for Z. C. M. I., were only representatives of the entire group for the purpose of submitting the bid, handling details and taking and transferring title to the property, and that the Commissioner's computations of market value are baseless. The record establishes beyond a doubt that those are the correct facts and no further explanation is needed.

The Government itself apparently does not put much faith in the partnership theory of the Internal Revenue Service, as in its brief and oral argument before this court it used a new theory to support the Commissioner's assessment of additional taxes. The Government now contends that while plaintiffs only paid $74,077 for their share of the property this amount was less than the recognized market value of the property and they were allowed to pay this reduced amount to compensate them for services they rendered in handling the transactions with the War Assets Administration and the other participants of the joint enterprise.

The increased valuation now argued for by the Government was arrived at by an erroneous application of the following facts. Before the amount of plaintiffs' participation was agreed upon on October 5, 1948, the plaintiffs had leased two portions of their property with the leases containing options to buy, one in the amount of $64,250 and the other in the amount of $85,000. A third such lease was entered into on October 11, 1948, six days after the final determination of plaintiffs' participation. The option to buy in this case was in the amount of $125,000. Defendant feels that this high valuation placed on the property by the plaintiffs represents the true value of their holdings, at least as to those pieces of property, at the time of the transfer and the difference between it and the $74,077 they actually paid is compensation to them and taxable as ordinary income. Defendant also points out that there was other property besides these three parcels which would tend to make the value higher yet, and feels it is significant that options to buy for such high amounts were made before final settlement as to the price they were to pay was made. The fallacy of defendant's argument is apparent.

The bid of $1,620,000, submitted on April 20, 1948, was accepted by the War Assets Administration on June 21, 1948, and the various participants of the bid immediately took possession of their selected property as did the plaintiffs. Plaintiffs' property, however, was relatively valueless at the time of acquisition. It became valuable only after the larger concerns participating in the bid began reconditioning their new acquisitions and the public suddenly realized that the mere presence of these concerns in the area would make the property valuable. While the above option agreements were entered into in 1948, sales for the property were not consummated until 1949, and the plaintiffs willingly paid capital gains taxes in that year on the profit they made. By setting such high prices for the option to buy, the plaintiffs may have anticipated a sudden increase in value but they cannot be taxed for such. Tax cannot be assessed until the profit has been realized.

The property acquired by plaintiffs was property that no one else wanted because it had no utility to them and as far as they were concerned was valueless. It is this very property that the War Assets Administration did not want to be "stuck" with and for that reason required a bid for the entire property and not for isolated portions thereof. Nevertheless, the defendant, initially through the Internal Revenue Service and now on new grounds before this court, placed a valuation on the plaintiffs' acquisitions greater in amount than those more desirable and more valuable pieces of property obtained by all other members of the bidding group with the exception of Z. C. M. I., the third member of the partnership alleged by the Internal Revenue. Plaintiffs' property was in fact not that valuable.

■ Therefore, the plaintiffs received no compensation or profits as the result of the purchase of the Remington Small Arms Plant from the War Assets Administration by the bidding group. They, along with Bennett of Z. C. M. I., were merely conduits of title. Plaintiffs' profits did not come until the following year when, pursuant to the option agreements, the sales were consummated. This being so, the 1948 taxable income of plaintiffs, John M. and Glenn W. Wallace, jointly, and Leland S. Swaner, individually, should not include the sum of $56,975.98 upon which the Commissioner of Internal Revenue has previously assessed taxes which were subsequently paid by the plaintiffs.

The second issue involved in this case concerns only the Wallaces. As noted above, they reported on their joint return for the year 1948 the receipt of a $20,000 distribution from the Excelsior Iron Mining Company but, in accordance with section 115 of the Internal Revenue Code of 1939, excluded $14,187.34 from taxable income as representing a tax free return of capital paid out of earnings, profits or increases in value of property existing or accrued on March 1, 1913. The Commissioner of Internal Revenue decided that since tax exempt income of this nature had already been received in previous years in excess of the cost basis of the stock, $20,000, any amount received in excess of that cost basis must be considered a liquidation dividend and be taxed as a capital gain. Defendant now takes the position that section 115(d) is applicable since there is no proof in the record of the cost of the company's property to it. It would therefore, defendant continues, be impossible to determine any increase in value up to March 1, 1913, if the cost of the property is not first shown.

It is the position of the court that the ruling of the Commissioner of Internal Revenue and the new contention advanced here by the defendant are unsound.

Section 115 expressly excluding from taxation any distribution of pre-March 1, 1913, values is as follows:

"Section 115(a) Definition of Dividend.—The term 'dividend' when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or in money or profits accumulated *after* February 28, 1913, or (2) out of the earnings or profits of the taxable year * * *. [Emphasis added.]

"(b) Source of distributions. For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property *accrued, before March 1, 1913, may be distributed exempt from tax*, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113. * * *." [Emphasis added.]

It is apparent from a reading of these sections that the only problem is to determine whether the *source* of the distribution was from pre-March 1, 1913,

earnings, profits or increases in value. If the source of the distribution in excess of the current year's earnings *was* pre-March 1, 1913, then the distribution is tax exempt regardless of the purpose of the distribution.

Taxing the distributions in excess of the current year's net income on the theory of a liquidation dividend as the Commissioner has done in this case is improper for two reasons: (1) The record clearly shows that the company has never been in liquidation and is still a going concern. It has never retired any stock, at least not since March 1, 1913, and the record clearly shows that the distributions made during the year in question, 1948, were not for the purpose of retiring any stock; (2) the facts conclusively indicate that the 70.93668 percent of the $20,000 distributed in 1948 represented earnings, profits or increases in value accumulated prior to March 1, 1913.

Even if we assume for the purpose of argument that the 1948 distribution in excess of current earnings was a liquidation dividend, if the source of that distribution was pre-March 1, 1913, it would still be nontaxable as section 115 (a) and (b) of the 1939 Code specifically exempts from taxation *any* values accruing before that date. The purported liquidating dividend would be in liquidation of such accumulations and, therefore, could not be taxed. Moreover, the distribution of pre-March 1, 1913, values cannot in any sense be called a "dividend." The above referred to section of the code excludes them from *dividend* treatment, and section 29.115–2 of Regulations 111, promulgated under the 1939 Code, states quite definitively that such a distribution "is not a dividend."

The defendant in its argument before this court places great stress on the cost of the property to the taxpayer as being an element in determining taxability of this type distribution when tax exempt distributions in excess of the cost basis of the taxpayer's stock have already been received by him. This contention is settled by the same rule relat-

ing to the source of the distribution stated above and has been clearly ruled on by this court in Higginson v. United States, 1948, 81 F.Supp. 254, 113 Ct.Cl. 131, cited by both parties. The defendant, however, attempts to distinguish that case from the case at bar, but that distinction is without merit. The Higginson decision interprets the statute properly, expounding the theory that it is the *source of the distribution* that determines the taxability or nontaxability of the distribution. While the nontaxable distribution will reduce the basis of the stock in the taxpayer's hands, section 115(b), there is no provision taxing as capital gain the receipt of any excess over the basis as long as the source of the distribution is from pre-March 1, 1913, values, earnings or profits.

The court states in Higginson, supra, as follows 81 F.Supp. at page 265, 113 Ct.Cl. at page 153:

" * * * The test of the exemption provided for in the statute is not the basis of the stock in the hands of the stockholder. The basis of the exemption from tax is the source of the distribution. The provision that the 'tax-free distribution' shall be applied against and reduce the basis of the stock 'provided in section 113,' relates to a matter entirely different from the taxation of the distributions when received; i. e., gain or loss upon the sale or disposition of the stock. The two provisions in subsection (b) are entirely consistent. The statute exempts the distributions from tax because they are treated as being in the nature of distributions of capital and they are applied against the basis of the stock, until they equal such basis, for the same reason. There is no indication whatever of any intention to impose a tax on the amounts distributed in excess of the basis. We think the obvious intention is to the contrary. The application of the distributions against the cost or other basis of the stock has no effect whatever upon taxa-

bility or nontaxability of the distributions when received by the stockholder."

The defendant, nevertheless, insists that subsection (d) of section 115 is applicable because there is no proof of cost of the property in the hands of the Excelsior Mining Company and no proof of increases in value thereof before March 1, 1913. Without this, it contends, it is impossible to determine whether or not the distribution came from pre-March 1, 1913, values, profits or earnings. That subsection provides as follows:

"(d) Other distributions from capital. If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. * * *"

That section obviously does not apply if the source of the distribution is pre-March 1, 1913. If the source was not pre-March 1, 1913, capital gains taxes apply to the excess received over cost basis of the stock in the taxpayer's hands.

■ We conclude that the source of the distribution in this case was pre-March 1, 1913. Every year since 1913 the Excelsior Iron Mining Company has distributed its *entire* net income to its stockholders; therefore, after the entire net income for the current year had been distributed, any excess must have been from increased values or earnings that had accrued as of March 1, 1913. Since the record shows that the entire net income since March 1, 1913, has been distributed to the stockholders, that is in itself sufficient to show that any distribution in excess of the current year's earnings must have been accrued before that date, especially since there was no liquidation or partial liquidation since that time. There is no other source from which it could have come. Therefore, the 70.93668 percent, or $14,187.34, of the 1948 distribution of $20,000 represents a return of values, earnings or profits that accrued prior to March 1, 1913, and is nontaxable under section 115 (a) and (b). Thus, the sums of $7,093.-67 and $1,406.46 [1] included in taxpayers 1948 income as the result of the above erroneous application of the law by the Commissioner of Internal Revenue should be excluded therefrom.

Accordingly, the court concludes that the income of plaintiffs, John M. Wallace, and Glenn W. Wallace, for the year 1948 should not include the sums of $56,-975.98, $7,093.67 and $1,406.46 and, therefore, judgment for the total overassessment and collection of tax and interest, which has been determined to be $50,401.42, plus interest at the rate of six percent per annum from the date of payment, will be entered in favor of these plaintiffs. The court also concludes that the income of plaintiff, Leland S. Swaner, for the year 1948 should not include the sum of $56,975.98 and that judgment will be entered in favor of this plaintiff in the amount of the total overassessment and collection of tax and interest, which has been determined to be $36,985.23, plus interest at the rate of six percent per annum from the date of payment.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

---

1. Originally defendant determined that $14,187.34 of the $20,000 was subject to capital gains provisions. Subsequently, however, this amount was reduced to $11,374.42 with the balance being treated as ordinary income. This resulted in an addition to taxpayer's taxable income of $1,406.46 upon which taxes were timely assessed. The Government now concedes that this was erroneous and contends that the entire $14,187.34 should be subject to capital gains provisions.